MOORE v. SMITH et al.

(Circuit Court of Appeals, Ninth Circuit. October 10, 1910.)

No. 1,830.

1. GUARDIAN AND WARD (§ 64*)—CARE OF WARD'S PROPERTY—PERSONAL USE OF FUNDS.

A guardian has no legal right to use his ward's money to pay his own debts even though he expects to return it.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 294–299; Dec. Dig. § 64.*]

2. EXECUTORS AND ADMINISTRATORS (§ 379*)—SALE OF PROPERTY BY EXECUTOR—VALIDITY—SUIT TO SET ASIDE.

Complainant's father and defendant, who were brothers, were joint owners of a sheep ranch, and organized a corporation to which they conveyed the property, the stock being issued to them in about equal amounts. Complainant's father died leaving his property by will to his three minor children, and making his nephew who was a lawyer his executor. The executor obtained an order of court authorizing him to sell the stock of the estate in the sheep company at not less than $75,000. and he and defendant endeavored to sell the property as a whole but without success. Subsequently defendant bought the stock owned by the estate from the executor for $85,000, borrowing the money to pay for the same from a bank. The sale was confirmed, and at the same time defendant was appointed guardian for the minor heirs, and on receiving the money from the executor used it in paying his notes to the bank. More than a year later he obtained an order permitting him to borrow the money of his wards by paying interest from that time, but without disclosing to the court the fact that he had previously appropriated it to his own use. During the most of the guardianship the nephew acted as his attorney. *Held*, that his use of the money of his wards not only was illegal, but that, on the evidence, the transaction by which their stock in the sheep company was sold was fraudulent as against them, and that complainant was entitled to have the same as to her set aside and to an accounting.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 1546; Dec. Dig. § 379.*]

Appeal from the Circuit Court of the United States for the District of Montana.

Suit in equity by Nellie Mae Moore against John M. Smith, Napoleon B. Smith, and Smith Bros. Sheep Company, a corporation, and Mary M. Smith as executrix of the estate of John M. Smith, deceased, substituted as defendant for the defendant John M. Smith. Decree for defendants, and complainant appeals. Reversed.

The record shows that for many years John M. Smith and William A. Smith, who were brothers, were the owners of a large amount of land in the state of Montana, upon which they carried on the sheep, cattle, and horse business. At first they managed the business themselves, but in 1890 they organized a corporation under the laws of Montana, under the name of Smith Bros. Sheep Company, to which corporation they conveyed all of their property. Each of them was married, and to the wife of each was given 5,000 shares of the capital stock of the company, which amounted to 250,000 shares. The remainder of the stock was divided equally between the brothers. The wife of William A. Smith deserted him in 1891, leaving three small children —the oldest a boy then seven years old, and two younger girls, the older of

whom was the complainant in this case and is the appellant here. These children William A. Smith subsequently sent to live with their aunt, a Mrs. Reynolds, in Ohio, who was a sister of the two brothers. Napoleon B. Smith, who was their nephew, was an attorney at law residing at White Sulphur Springs, Meagher county, Mont., in which county most of the property of the brothers was situated, and in which they both resided. William A. Smith died there on February 13, 1897, and on his deathbed made his will, which was drawn by Napoleon B. Smith, by which will he left all of his estate to his three children and appointed his said nephew executor thereof.

During the course of his examination as a witness, John M. Smith was asked what, if any, request his brother William made of him in his last illness regarding his children, and answered: "A. The last words that he said to me was 'N. B. Smith is my administrator, and he will attend to the affairs in that way, and I want you to look after the interests of my children.' Those were the dying words that he said. Q. And did you say you would? A. I said I would, and I have, faithfully." At the time of his death William A. Smith was the owner of 122,950 shares of the stock of the Smith Bros. Sheep Company—John M. Smith then owning a majority of the stock.

The case shows that John M. Smith was himself then in poor health, as was his wife, and that in consequence he spent much of his time at Pasadena, Cal., where he was at the time of much of the correspondence hereinafter referred to. Some time after the business was incorporated one McNaught, who was a brother-in-law of John M. Smith, became manager of the property under the supervision and direction of the latter. The will of William A. Smith was admitted to probate, and Napoleon B. Smith became executor of his estate. After the death of William A. Smith, and because of the age and poor health of John M. Smith, and perhaps for other reasons, both John M. Smith and the executor became desirous of selling the whole property. A sale by John M. Smith of his majority of the stock to a stranger might have worked to the injury of the minority interest of the children of the deceased William A. Smith, so that both John M. Smith and the executor of the estate of William A. Smith became desirous that both interests be sold together. Repeated efforts in that behalf failed of accomplishment.

On the 23d of November, 1897, McNaught asked for an option of purchase, to run until the end of the year, on all of the property, free of debts, except future payments on certain railroad land contracts, on which application J. M. Smith endorsed this:

"My figuers is two hunderd and twenty thousend $220000 Subject to the aprovel of Mary Smith (wife of John M. Smith) & N. B. Smith to date from Jan 1" 1892 time to complete sale about to the 10 of Jan. 1898. J. M. Smith."

The executor of the estate of William A. Smith indorsed thereon the following:

"In case a buyer can be found for the property at the amount above stated I will immediately make application to the District Court of Meagher County, Montana, to sell the interest of the Estate of W. A. Smith, deceased, in said property at the rate above stated. [Signed] N. B. Smith."

The evidence shows that the executor regarded the estimate of John M. Smith as to the value of the property at the time too high, as did others.

On the 14th of December, 1897, John M. Smith wrote a letter from Martinsdale, Mont., to the executor, which reads in part as follows:

"N. B. Smith Der Sir & Nefue. * * * Mr. McNaught is back from Helena he could not get a party to take hold of the property, but I think the chance will be better next sommer I want to sell out so as to go some plase that I can be with my famley & can send Stanely [his son] to school as long as I hold it I can't be sadesfied away from it & I dont want to sell out & leave the childrens interest in it I think the coming year will be the time to let gow of the intire plant you can at the next turm get a permit to sell wills intrest at anney time that we can get fair value for it then we can go ahead with it when the opertunity Shows up I think it will be well to arange that the next turm of Court I dont think that we will sell much befoar next July or Auges but I dew want to sell as soon as we can to advantage if I was yong I would not cair to sell for it is a good property well managed at what I ask for it."

The record shows that on the 24th day of January, 1898, the judge of the probate court made an order based upon the application of the executor, authorizing him to sell all of the 122,950 shares of the stock of the company belonging to the estate of William A. Smith, deceased, "at private sale, and without previous notice, provided that said personal property be sold at a sum not less than seventy-five thousand dollars, and may indorse said stock for the purpose of said sale, and may do all other acts and things requisite and necessary to transfer all of the interest of said estate in and to said stock and the property represented by said stock. That said stock be present at the time of said sale, and that said executor present to this court at the next term thereof after such sale, an account of sale, verified by his affidavit."

On the 19th of the following March, John M. Smith wrote a letter from Helena, Mont., to the executor, which is in part as follows:

"Mr. N. B. Smith Dear Nefue I wish to get the least price that you can excep for the children stalk [stock] I may have to dew some figuering to sell the Plant & in case I knawd fest how much I could drop and pay all debts it would give me a chance to handel my self what would you give me a opten on the Stock after the debts is payed I think you said the order was for you to sell for $75,000 but we think we can dew better then that I think I can get them 80 or 85000 out it clear for them now can you name enney price that would soat you to give a opchen on so I might have a maregen to mark [work] on think the matter over & let me know. . . . (Signed) J. M. Smith."

On March 25th, 1898, the executor replied as follows:

"Office of N. B. Smith, County Attorney, Meagher County.

"White Sulphur Springs, Mont. March 25th, 1898.

"Dear Uncle: Your letter in regard to the stock of the estate came to hand. I have been thinking over the matter. I think rather than see a sale go bye I would be willing to take eighty-five thousand dollars for the stock. I want to do what is fair by the estate and also by you. I want to see a sale go through in some shape, but at the same time I want to do the best I can for the estate. I would want the eighty-five thousand dollars alone for the stock, and the party who gets the stock to pay all the debts of the Company, and also that the sheep company caucel whatever debts it might have against the Alice or Blackhawk Mining Companies. Yours truly, [Signed] N. M. Smith."

July 2, 1898, John M. Smith wrote to the executor as follows:

"Smiths Ranch July 2 1898.

"N. B. Smith Dear Nefue

"I have bin figerin Since you laft on this Sheep Sale you know that our Judgment difers as to the value of the property you being willen to take less then would sadesfy me & thaught that you would rether than miss a sail would take $80000 for the pert you represent rether then miss a sail it was on that bases that I made my offer to Mc My offer gave me a maregen that would sadesfy me but if I dont have a small margen it cuts me down so low that I dont feal sadesfiged if I had made my figers with the intent of giving you the benefit of my Judgement I should have plase my figers higer then I did so you can see that your estemate throwd me off in my calculation & will bring me out with less money then is sadesfactery to me & Mary I told her as you was willing to take less then I thought the stock worth & I was willing to take 80000 that I would have a margin to work on & bost my offer acorded now under theas circumstances I think you can afoard to take $84000 as your figers estemate 85000 now if I can have a small margen to work on as I dont know jest what it will take to Squair all debts but I think if I can get yours at 84,000 that I will still have a Small margein to work on if this deel goes but I would not be sadesfied to take the offer & devide equel as our Judgement difered as to value I made the offer below what I should have done if I had not had some aserence that you would take 80000 for the interst now if you think you can take 84000 I think that will be be very close to to it if the sail goes if you cant aford to take that Mary may not sell her stock & that will spoil the sale if enny can be made atall. let me know at once So I can calculat acorden. Your uncel, John M. Smith."

"If we dont sell this time we may get that much."

December 30, 1898, came without the effecting of any sale, although strenuous efforts in that behalf were made by John M. Smith (to one Miles, among others) as well as by McNaught. On the day last mentioned Henry Neill made to the executor the cash offer of eighty thousand dollars for the stock belonging to the estate. The next day the executor wrote to John M. Smith this letter:

"Office of N. B. Smith, County Attorney, Meagher County.

"White Sulphur Springs, Mont., Dec. 31st, 1898.

"Dear Uncle: Neill of Helena was in to see me yesterday in regard to the ranch property. He wanted an option on my interest. I told him I could not give it at this time as I had let you have an option. If you are figuring on Miles making a trade I think you had better look for other parties. Neill thinks he can sell the property. I am very anxious to do something with the property as I feel that the estate is going to lose money by holding it. Heitman and Danzer have a large number of sheep feeding in east and it is the prevailing opinion of those who know that they will lose from 50 cents to a dollar a head on the transaction. Neill said he would make me a cash offer of $80000.00 for the estate's interest in the property. If you will make me a cash offer of $85000.00 you can have the property. I told Neill I would not make such an offer. McNaught writes me that you now owe the Company $13839.35, and that the Company will have to commence borrowing money. If you do not take the stock it would be your duty to put your note in to the Company for the amount so that the Company could raise the money on the same to carry on the business. Under our law the only way money can be drawn out of a company by a stockholder is by declaring so much dividend on each share of stock. I do not make the suggestion to hurt your feelings, but you know yourself that such large transaction should not be carried on in such a loose way. Please let me hear from you in the matter. We are all well. I wish you all a happy new year. I got a letter from Barnes at your place. Give all the Montana people my best regards. Your nephew."

On the 14th of January, 1899, John M. Smith wrote to Mr. George L. Ramsey, cashier of the Union Bank & Trust Company, Helena, Mont., this letter:

"Pasadena, Cal., Jan. 14, 1899.

"Mr. George L. Ramsey Helena Mont.

"Would your bank lone ninty thousand dollars to me & take the entire stock of the Smith Bros Sheep Co as security.

"I consider it gilt edge I am about to buy the estates intrest I will onley want it ontell I can make a sale of the property perheps 4 or 5 months Wire me your lowest rate of Intrest & if can get it wire at my expence all the Compny owes is the $2000—that I sent the Note for the othr day Yeus Truely J M Smith."

Two days thereafter, to wit, January 16, 1899, John M. Smith wrote from Pasadena, Cal., to the executor at White Sulphur Springs, Mont., as follows:

"N B Smith Dear Nefue W S Springs I wired you that I would except your offer for the Stock of the Sheep plant beloning to the children I have not herd from Miles yet if he makes a raise I will pay you the $90000 if he fails I will give you the $85000 that you aske you of corse would put it in govemont bonds if you had it now to make things safe & you be absolutly safe I will give you all of the Sheep Company Stock to hold as security for the payment of the $85000 & I will pay the same interst that you would get on Gov bonds & pay you 3 times per year ontill I can sell out to advantage then you will be safe & if enny one is looser it will be me & I am willing to take the chances they never will be a time but what the hole business will bee the best of security for that amount but I dont intend to hold it very long at enny time that I can make a good sale I will pay off your $85000 I think this the best way for us to close up business I intend never to run less than 40000 head of sheep on the ranch as long as I have ennything to dew with it by you holding all the stock as Security no one could com in ontill your Note is payed first I never tried to get in debt much enny more as I intend to keep close payed up all land payments & Taxes & keep the Smith Bros Sheep Co Cr as good as it has always bin you can

get up the papers so you ar safe & at the same time gives me a chance to handel my self to advantage if Miles fails you & Mack can fix things so that I will not have to come ontill Apr or May or may <del>Jan</del> ^you can^ Send the papers down hear for I and Mary to signe I will pay all revenew Stamps required I don't think you will have to pay taxes on the $85000 while it is repsented by the Smith Bros. Sheep Co Stok as I have to pay on all the property if you did have to pay taxes I will agree to pay it for you So it will leave it just the same as gov bonds now I hope you will consider this & after Feb the first proceed to fix up the papers or soaner if you wish I could Borrow the money of the Bank at Helena by giving the sae seciorty but I would soaner deel with you & you ar jest as safe as tho you had gov bonds let me hear from you at once & oblige Your uncel John."

On the same day, to wit, January 16, 1899, the executor wrote from White Sulphur Springs, Mont., to John M. Smith at Pasadena, Cal., the following letter:

"Office of N. B. Smith, County Attorney, Meagher County.

"White Sulphur Springs, Mont., Jan 16th, 1899.

"John M. Smith, Pasadena, Cal.

"Dear Uncle: Your telegram came to hand in which you said you would take the stock. I want a clear understanding with you, so that there may be no hereafter in the matter. It is understood that I am to get eighty-five thousand dollars for the stock and the estate is to have that and not owe the Company anything for money advanced for uncle Bill's estate. Mack wrote me the other day about the four hundred dollars you were to pay, but I will make no claim as to that if you take the property at the above figures. You had better pay a portion down and then I will make the return to the court, and if the Court approves the sale, of which I have no doubt, I will want the remainder of the money. Please let me hear from you at once in the matter. Yours Truly, W. B. Smith."

The record shows that on the 20th of January, 1899, the executor wrote to John M. Smith a letter which in some way disappeared, and is not produced. Before it could have been received at Pasadena, Cal., John M. Smith wrote from that place to the executor this letter:

"Pasadena Cal Jan 22 1899

"N. B. Smith Dear Nefue I received yours of the 16 in reply to my telegram I had written 2 letters that you have no dout receved befoar this in which I asked turms but have not herd from ether yet it dont look as tho Miles is going to make a deel. I now will ask you the amount you wish me to pay down on the property & what interst you want on the balence I will take the astates Stock at the $85000 and no claim on the astate for enny money advanced it at enny time tell me the least you will take as a down payment & what time you will give on the balence & & what interst ontill payed & you hold all the property as securty I made you a propersition in my last but don't know how it will soat you pleas give me yours best turms as soan as you get this and I will arange to meet it on the $85000 bases Yours Truly Your uncle John.

"I think the Coart will aprove of the Securty & offer for the balence I know your Bondsman would I dont think that it will take me longer then May the first to make some turn So I will get the balence for you."

On the 21st of January, 1899, Mr. Ramsey, cashier of the Union Bank & Trust Company, of Helena, Mont., wrote this letter to John M. Smith:

"Mr. J. M. Smith, Pasadena, California.

"Dear Sir: In response to your favor of the 14th, we have wired you today that we would make the loan of $90,000 at 9% interest. We suggested in the telegram, however, that the offer to make would be based upon whether or not you should use the money at once. Unless you could take it right away, we would not, of course, want to carry so large a sum here for any particular length of time, awaiting investment. I really hope you will be able to use it. If you have not telegraphed us at the time this letter reaches you of your conclusion as to whether or not you can use the money, we want to ask you to do so, as the loan is a large one and we

might have to loan the funds elsewhere, which we would not do, in anticipation of your possible call for these funds. Yours respectfully, George L. Ramsey, Cashier."

That John M. Smith replied by wire to the letter last quoted that he did not want the money, is shown by this letter from Ramsey of date January 28th, 1899:

"January 28, 1899.

"Mr. John M. Smith, Pasadena, Cal.

"Dear Sir: We now have your telegram reading: 'Do not want money' which is interpreted to mean that you are not in a position to use the money just at the present time. But that you may possibly desire to later. If our surmise is correct, I beg to advise you that we will be glad to figure with you whenever you are ready; but we would not of course want to promise so large an amount of money at any time in the future as it is a considerable sum and we may have to invest it elsewhere. Just at this time we would be very glad to make the loan and it is possible we may be in the same position whenever you get ready. Yours respectfully, George L. Ramsey, Cashier."

January 24, 1899, the executor wrote to John M. Smith at Pasadena, Cal., as follows:

"N. B. Smith, County Attorney, Meagher County.

"White Sulphur Springs, Mont., Jan. 24th, 1899.

"J. M. Smith, Pasadena, California.

"Dear Uncle: Your letter of the 16th of Jan. came to hand. I can not sell the way you indicated. The only way I can sell is for cash down. If you are appointed Guardian of the children then I could turn the money over to you. As I told you all the time I have no right to sell on credit. You had better forward me a draft for ten thousand and then I will file the petition, and on the approval of sale by the Court the balance can be paid. The offer that I had was a cash down offer. If you but [buy] the stock the Company can run on just the same and I can act as one of the trustees as I have some stock in my own name. Give my love to all. Yours, etc."

Before the letter last quoted could have been received, John M. Smith wrote from Pasadena to the executor as follows:

"Pasadena, Cal., Jan. 27.

"N. B. Smith:

"Dear Nefue: I receved yous of the 20 & I think your plan good I will take steps to get the ten thousend down payment & we will proceed to business at once I will write to the Bank & arange for the money if you have me apointed garden for the Children as soon as I as sell out I uou & ["wan to," according to original exhibit] invest in Gove bonds all thair money and also my one as I dont intend to try to dew anny buisness after I sell out & I fully intend to let goew this spring I think your sugjestion a good one I think I should have the children come out hear the schools is first clas & the climat is good also good society Yous Treuly J. M. Smith." "will wright agane soon."

On the same day, to wit, January 27, 1899, John M. Smith wrote from Pasadena, Cal., to Ramsey, this letter:

"Pasadena Cal Jan 27, 99.

"G L Ramsy Helena Mont

"I received yours of the 23 in regard to the mony I did not want it all at once. I received a letter today from the adminestrator & now I am in shape to use ten thousand of the money at once. I wish the lone for 6 months with the understanding that I have the privilege of paying it at enny time I can befour it is dew intrest to be at the same for what time I have used the money. You understand I want the money to make a payment on the estate of my brother the money will be turned ovr to the adminestrator N B Smith at White Sulpher Springes. if you will you can make out a Note for ten thousand & send it hear to me I will signe & retern then I will turn it over to the admnestratr & close a deel then I will be the entier oner of the Smith Bros Sheep Co Yous respctfuly J M Smith."

Four days thereafter, to wit, January 31, 1899, John M. Smith wrote to Ramsey as follows:

"Pasadena Cal Jan 31 1899

"George L Ramsey Helena

"Sir: I have taken the liberty of drawing a check on your Bank for ten thousend Dollars $10,000—in favor of N. B. Smith of White Sulphr Springes the adminestratr of my Brothers astate I dont think that the money will be caled for onley plast to his cr. I inclose his letter so you can se how we intend to manage so that I don't think we will have to call for enny of the money will leave it as a creddet for when I am apointed gardeen of the children I will turn it all back to the Bank & .pay what intrest has acrued for what time we have the money. hoping this will meat your aprovel I wrote you a letter a few days ago asking you to forward me a Note for $10,000—for me to signe but I have not receved it yet hoping you can favor me with my request & oblige J M Smith."

On the 2d of February, 1899, Ramsey wrote to John M. Smith as follows: "Mr. John M. Smith, Pasadena, California.

"Dear Sir: We inclose you herewith a blank note for $10,000, sent agreeable to your favor of the 27th, drawn for six months, with the understanding that you shall have the privilege of taking it up at any time prior to maturity if you like, interest to be charged only for the actual time the money is in use. I also inclose several blank notes, which can be filled up by you at any time the money is needed. With regards, I am,

"Yours respectfully,          George L. Ramsey, Cashier."

On February 6, 1899, Ramsey wrote to John M. Smith as follows: "Mr. J. M. Smith, Pasadena, California.

"Dear Sir: We now receive your letter of January 1st [31st], and beg to advise that we shall have pleasure in honoring your check for $10,000, when it shall be presented. We return herewith letter from N. B. Smith. With regards, I am,

"Yours respectfully,          George L. Ramsey, Cashier."

On February 6th Ramsey also wrote to N. B. Smith this letter:

"Union Bank & Trust Company of Montana.

"Helena, Feb. 6, 1899.

"Mr. N. B. Smith, White Sulphur Springs.

"Dear Sir: Receiving a letter to-day from Mr. J. M. Smith, advising that he had drawn on us for $10,000.00 in your favor, and his letter indicating that he would probably draw further checks, I am lead to suggest that we would be very happy indeed to serve you as a depository, for all or a part of the proceeds of the check, if it is in your plans to leave it on deposit.

"Yours respectfully,          George L. Ramsey, Cashier."

On the 8th of February, 1899, John M. Smith wrote to Ramsey as follows:

"Pasadena Cal Feb 8 1899

"G L Ramsey yours of the 2 came to land last night I hear signe & return Note. When I am caled on for the balence I will fil out & send on Notes to cover the balence of the perches. I dont think that one dollar of it will be caled for except as a credet as you saw in my last letter the way N B Smith perposes to dew with me Many thanks for your acomedation Yous Truely John M. Smith."

On the same day, to wit, February 8, 1899, the executor wrote from White Sulphur Springs, Mont., to the Union Bank & Trust Company, as follows:

"White Sulphur Springs, Mont., Feb. 8th, 1899.

"Union Bank and Trust Co., Helena, Mont.

"Gentlemen: I don't know yet what disposition I will make of the Money that J. M. Smith will place to my credit. I would want a certificate of deposit payable on demand. If my Mr. Smith is appointed guardian this money will be turned back to him. I will make no arrangements about the money at this time as I want to get the estate settled up as soon as possible. Yours truly, N. B. Smith."

On February 10, 1899, a certificate of deposit for $10,000 was issued by the Union Bank & Trust Company, and sent to the executor, with a letter of that date in which the bank said:

"We are this morning placed in possession of your favor of the 8th instant and having instructions from the First National Bank of White Sulphur Springs to send you certificate of deposit for J. M. Smith's check of $10,000, we are now having pleasure in handing you same herewith. We note that you do not care to make any arrangements about the money at this time, as it is your desire to get the estate settled as soon as possible." · `

On February 12, 1899, the executor wrote to the Union Bank & Trust Company this letter:

"White Sulphur Springs, Mont., Feb. 12, 1899.
"Union Bank & Trust Co., Helena, Montana.

"Gentlemen: Your favor of the 10th enclosing draft for $100000 [$10000] came to hand. I am much obliged to you for your kindness in the matter. I presume I will leave the money with you for the present as I have no use for it. If my uncle is appointed guardian of the children, then in that case, the money will all be turned back to him as guardian. I think I can wind up the estate within three months. I shall be pleased to meet you when I come to Helena which may be some time in this month.

"Very respectfully, N. B. Smith."

The executor proceeded to make application for the confirmation of the sale of the stock, and engaged, in behalf of John M. Smith, an attorney named Waterman to make application for the appointment of John M. Smith as guardian of the children—the return of sale being filed with the court by the executor on the 20th of February, 1899, and three days thereafter, to wit, February 23d, John M. Smith's application for his appointment as guardian of the children was filed by Max Waterman as his attorney. On that same day, to wit, February 23, 1899, the executor wrote to Mrs. Reynolds this letter:

"Office of N. B. Smith, County Attorney, Meagher County.

"White Sulphur Springs, Mont., Feb. 23rd, 1899.

"Dear Aunt: Uncle John intends to apply to be the permanent guardian of the children. I presume you will be notified in the matter. Under our law a child that is fourteen years of age can appoint his own guardian. I think Willie is about that age. If he is that old he can appoint who he wants and the Court will confirm the appointment. Under our law a guardian has to be appointed so that the estate can be distributed. The estate will have to go into the hands of a guardian so that it can be invested in bonds. Uncle John's address is 481 Eldorado Street, Pasadena, California. He will have to give a bond to the amount of about ninety thousand dollars. I don't think he will make any change in the case of the children, and he can't make any change after the children become 14 years of age for then they can appoint their own guardian. I thought it my duty to mention the fact to you so that you might understand the proceedings and why they were taken. You see I will have the eighty-five thousand dollars and the same must be invested which I could not well do as executor. It was Uncle Will's desire that you should look after the children and that desire will be no doubt carried out. I have explained fully because I thought you might worry in the matter. If you have any suggestion to offer would like to hear from you in the matter. Give my love to the children. Yours, etc., N. B. Smith."

On the 1st day of March, 1899, John M. Smith wrote from Pasadena, Cal., to Mr. Ramsey at Helena, Mont., as follows:

"Pasadena, Cal. March 1, 1899.

"George L. Remsey Helena Mont If enny one deposets $5000—to my Cr for a option Wire me at once at my expen 481 El Dorado St Pasadena Cal.

"I cant say jest when I will be cald to turn over the other $75000—on the Ranch Deele. the Money will not be drawed out of the Bank but left as a Cr to the administrater N B Smith as soon as I am apointed gerdean the money will be turned back to me I pay intrest for what time I have it. Will I have to send my note or can you pay my check by Cr to N B Smith fer the amout & he leave it in the bank & transfer it back to me Yous Tuely J M Smith."

March 10, 1899, the Union Bank & Trust Company wrote to N. B. Smith this letter:

"Union Bank & Trust Company. Helena, March 10, 1899.

"Mr. N. B. Smith, White Sulphur Springs.

"Dear Sir: As you are perhaps aware, we had made arrangements with Mr. John M. Smith to advance him the sum necessary to purchase the estate's half interest in the Company. He writes us by letter received today, as follows: 'I can't say just when I will be called to turn over the other $75,000.00 on the ranch deal.' The amount to be advanced on this transaction is a large one, and we like to figure ahead a little bit, so that we may calculate at all times upon the amounts which we have arranged to advance to our several customers, and I am going to take the liberty of inquiring whether you can tell us at this time about when the balance will be called for, so that we can figure accordingly. We felt quite a bit complimented at your making us your depository for the payment that has already been made by Mr. Smith, and I assure you we will be happy to serve you in the future as well.

"Yours respectfully, George L. Ramsey, Cashier."

On the 28th of March, 1899, the sale of the stock to John M. Smith was confirmed, and the order of confirmation signed and filed. On the same day, to wit, March 28, 1899, John M. Smith who was then in California, was appointed guardian of the persons and estates of the minors, the order made and filed reciting due notice of the application, and directing "that letters of guardianship of the persons and estates of said minors be issued to him upon his giving a bond to each of said minors in the penal sum of thirty thousand dollars, and upon his taking and subscribing the oath according to law."

On the 18th of April, 1899, John M. Smith wrote from Pasadena, Cal., to Mr. Ramsey at Helena, Mont., as follows:

"Pasadena, Cal Apr 1899

"Mr. G. L. Ramsey Helena Mont

"I will be in Helena about the 18 of May. I leave hear the 13 then I will be redey to straten out business sadsfactry I hope I will have McNaught send the Stock over to the Bank so it will be thair when I get back I will have N B Smith meet me in Helena & then we can fix up every thing sadesfactry I drew a check to N B Smith for $75,000—but I dont think he will Send it in ontill I get back Yous Truely J. M. Smith."

April 24, 1899, the bank replied to John M. Smith by letter, saying: "We are ready to honor your check for $75,000.00 when Mr. N. B. presents the same."

On the 27th of April, 1899, a four-months note for $75,000 of John M. Smith, bearing 9 per cent. interest, was cashed by the Union Bank & Trust Company, and the proceeds put to his credit, with which the bank paid the $75,000 check which John M. Smith had given upon it to the executor, and which was by the executor indorsed, such payment being then charged by the Bank & Trust Company to John M. Smith's account. The before-mentioned $10,000 certificate of deposit was at the same time surrendered by the executor, who took from the Bank & Trust Company a certificate of deposit to his order for $80,000 and deposited $5,000 of the amounts mentioned to his personal credit; $2,161.49 of which he paid himself as due him "on the sale of the property," and the balance to other persons and for other purposes.

On the 28th of April, 1899, John M. Smith wrote from Long Beach, Cal., to the executor, this letter:

"Long Beach, Cal., Apr. 28, 1899.

"N. B. Smith:

"Dear Nefue I return Pour of atorney [appointing N. B. Smith John M. Smith's attorney in fact] with instictions to indors the stock that I bought of you to the union Bank as colotral security for the payment of the $10,000 & $75,000 nots now in the bank. I am booked to leave hear the 13 of May for Helena will arive about the 17 or 18 & want you to meat me in Helena at that time if I should deside to make it later I will wire you to that afect. * * * Yors Truly our love to orseal J M S"

John M. Smith returned to Montana from California on the 18th of May, 1899, and on the 25th of the same month executed his bond as guardian and took the oath of office and filed them with the court. June 1, 1899, the executor filed the final account of his administration of the estate of William A. Smith, and on the 12th of June of the same year a decree settling the account and distributing the estate was signed and on the 14th of June, 1899, placed upon file, the decree providing, among other things: "That the said executor shall be finally discharged from his duties as such executor upon his filing a receipt for the residue of said personal property duly signed by John M. Smith as guardian of William Smith, Nellie Mae Smith, and Annie Maud Smith, minor children of said deceased, and upon the filing of such receipt his bondsmen as such executor shall be discharged."

On the same day, to wit, June 14, 1899, the executor paid the entire amount in his hands over to the guardian, John M. Smith, and took his receipt therefor as such guardian, whereupon an order of final discharge of the executor was signed and filed. John M. Smith thereupon went to Helena, Mont., and, on the 17th of June, 1899, there used the money of his wards so received by him in discharging his indebtedness to that bank, as far as it would go, giving a new note to the bank for the balance due it from him. John M. Smith was questioned in respect to that matter when upon the stand as a witness in this cause, and gave this testimony:

"Q. Mr. Smith, I believe you said this morning, that you had used the money turned over to you by Mr. N. B. Smith when you were appointed guardian, to pay your notes at the bank? A. I did.

"Q. Was the money cash that he turned over to you, or was it certificates of deposit? A. It was a certificate of deposit; it wasn't counted out as cash, but it was a credit certificate of deposit that he turned over to me when I qualified as guardian, he turned it over to me as administrator. I done business with the bank here, and I will refer to them. I cannot remember just about how it was done at the time, but I will refer you to the bank and Geo. L. Ramsey; they are better authority than my memory is, a great deal.

"Q. I will state, Mr. Smith, for your information, that these two certificates of deposit were produced here by the bank officers. A. The certificates of deposit were turned over to me as guardian of the children of William Smith by the administrator.

"Q. And you turned them into the bank in payment of your note? A. I thought I had a right to.

"Q. But you did? A. I did, and I thought I had a right to, because I gave security for the amount.

"Q. Did you understand when you did that that you were using money of minors for your own purposes? A. I understood I was using it, and that I had a right to; I didn't talk with any one about it.

"Q. You thought that you had a right to take the money of minors and use it to pay your debts? A. As I had given security for that money, it was the same as though it was in my possession.

"Q. Do you understand that you, as a guardian, had the right to use guardianship money, the money of minors, to pay your own debts and for your own personal account? A. I may have made a mistake, but I didn't do it with the intention of defrauding anybody; I might have made a mistake.

"Q. But you knew what you were doing? A. I knew I was paying off my indebtedness.

"Q. And using the money of minors? A. The money that was given security for.

"Q. Without asking anybody's permission? A. Without asking anybody's permission.

"Q. Without consulting anybody? A. I didn't do it with the intention of defrauding anybody, and if I have wronged anybody in any way I am willing to make it right.

"Q. Was it your view at that time that you as guardian had a right to do such a thing? A. I thought this way: that it was just the same as if I put it in government bonds if I paid the same interest. I acknowledge

it may have been wrong, but I didn't do it with the intention of defrauding anybody. I paid off my note, and that is the condition of things just as they were."

N. B. Smith, the executor, testified that he did not know until the fall of 1899 what use the guardian had made of his wards' money; that "in October, or before October," 1899, the guardian told him. He also testified in answer to the question, "Did you report the fact to the judge of the court that the money you had given to John M. Smith, turned over to him as guardian, had been used by him to pay off his own debts?" "I made no such report whatever."

On the 20th of November, 1899, N. B. Smith wrote to Mrs. Reynolds this letter:

"Office of N. B. Smith, County Attorney, Meagher County.

"White Sulphur Springs, Mont. Nov. 20th, 1898 [1899]

"Mrs. D. B. Reynolds, Fayette, Ohio.

"My Dear Aunt: Enclosed find draft for your charges for looking after and caring for the minor children of Uncle Bill, until December first, 1899. Please sign the enclosed receipt. In regard to uncle John buying the stock will say that he borrowed the money from a bank in Helena to buy the stock. I would not let him have the stock until he had actually paid me the money. I had the money in my name in the bank until I was finally discharged from my trust. When I made my final account I showed the judge my draft, and my bank account subject to check. I turned over to him the money and took his receipt for the same, and filed the same in court and the same is now a matter of record. The Union Bank & Trust Company furnished his bond and same is perfectly good. He has to pay the bank quite a sum of money for furnishing the same. I think he has to pay about three hundred dollars a year for his bond. The judge and Uncle John and I talked over the matter of the use of the money, and the understanding was that he should pay four per cent. for the use of the money until such time as it should be invested in bonds. That is better than we could do with government bonds, and as long as the Union Bank & Trust Company is his surety the same is perfectly safe. Nothing has been said as to the compensation that the court will allow him. I think the compensation would be arrived at in this way, he would be allowed his actual expenses in looking after the children, and a reasonable amount for what time spent in looking after the children and their estate, and the costs connected with the court procedure. In cases of administrators the law fixes the compensation at a certain per cent., based on the value of the estate. I don't think the court would fix his compensation at anything unreasonable. Uncle Bill reposed confidence in me and I think I did the best thing for his children that could have been done in making the sale. Before making the sale I talked with the best business men of the county in relation to the matter, and not one but what told me to close the sale as I had made a great deal. Although I am no longer administrator, yet I shall always look after their interests.   *   *   *   Your nephew."

Both John M. Smith and N. B. Smith gave some testimony tending to show that in 1899 the former had some talk with the judge of the court in which the guardianship matter was pending, about his (John M. Smith's) using the money of the minors and paying interest on it at the rate of 4 per cent. per annum.

In December, 1900, this order was made and entered in the matter of the estate and guardianship of the minors:

"Probate Minutes, December, 1900.

"Tuesday, the Eleventh day of December, 1900.

255.

"Estate and Guardianship of Wm. Smith, et al., Minors.

"Max Waterman, counsel for guardianship, asked to have his name withdrawn as counsel in the case. N. B. Smith asked to have his name entered as counsel instead of the Max Waterman's. John M. Smith, the guardian of said minors, having made application to the court for an order authoriz-

ing him to borrow the funds in his hands belonging to said minors amounting to the sum of about $82,000 at the rate of three per cent. per annum.

"The court being fully advised in the premises: It is ordered that said guardian be authorized to borrow said sum of $82,000 at the rate of 3% per annum, and to so hold the same at said interest until the further order of this court."

N. B. Smith testified that he did not procure this order to be made, and did not know of it at the time. He admits in his testimony that he thereafter acted as the attorney of the guardian, and prepared the final account of the latter in which the wards were charged for the money paid by the guardian to the surety company for going on his bond as guardian, and in which also the guardian was charged interest on the money of the wards only from December 11, 1900, and at the rate of 3 per cent. per annum, but claims that, as respects the interest, his doing so was an inadvertent mistake.

In regard to his guardianship attorney John M. Smith was questioned and answered as follows:

"Q. Who was your lawyer in the guardianship matters? A. Waterman for about a year and a half or two years, I forget about it, but Waterman acted as my attorney.

"Q. Max Waterman, of White Sulphur Springs? A. Yes, he used to assist me about court matters and get the accounts in and accepted. I didn't know anything about the business myself. Badger made out some first of it, and Waterman acted lated on, and after that I had N. B. Smith. He was fairly conversant with everything, and I knew he would do the square business by all the parties concerned and so I got him after that—after Waterman."

And there is in the record this letter from John M. Smith to Mr. Ramsey, of date October 15, 1900:

"Martindale, Mont. Oct 15 1890 [1900]

"Geo L Ramsey Helena I· have sent to the Springes to have N. B. Smith fill out my report as Gardien of Brother William he is my attorney & keeps My acounts it will be in in a few days as filed in caar. Your treuly J M Smith."

The appellant was but 10 years old when the stock was sold, and became 18 on the 27th of August, 1906. On the 5th of November of the same year her guardian paid her the amount shown to be due her by his final account, which had been approved by the probate court.

In the deposition of the complainant which was introduced on the trial of the cause, she was asked, among other things, what information she had regarding the sale of the stock, when her guardian settled with her in November, 1906, to which interrogatory she answered:

"I knew that the sale had been made, of course, and I knew that uncle John has been the purchaser—that is all I knew. I knew nothing about the stock company or the incorporation of the company. I received my money, and that was all I knew about it—what he gave me."

Being asked what knowledge she had at that time regarding the method, validity, and good faith of the sale of the stock, she answered:

"I had no knowledge of its method, its validity, or of its good faith, and knew nothing about their intentions."

In response to the interrogatory, "What was told you by your uncle, John M. Smith, or your cousin, Napoleon B. Smith, the above-named defendants, about your affairs, and particularly about the sale of said stock?" she answered:

"Nothing was told me by either John M. Smith or Napoleon B. Smith, concerning the estate in any way—unless I asked it directly, and I never talked to 'Poly' about my affairs very much, but I have spoken to Uncle John—he· always avoided me or would talk in an indirect way, and I knew no more when I finished than when I begun. He didn't seem to care about discussing it very much—he didn't want me to think much about it. I once asked him about the difference between his estate and ours and why he had more than we had, and he said, 'Papa owed large sums of money when he

died, and they had to be paid off.' I also spoke about the 3 per cent. which was paid us on our money, and asked him why he didn't give us more—he said, 'It was all he could afford.' 'Poly' never told me anything at all, except what we had, and in fact intimating that we ought to be thankful for what we got."

Both John M. Smith and N. B. Smith were questioned in respect to conversations they had with the complainant.

John M. Smith gave this testimony:

"Q. Do you remember when the complainant in this suit came out to the ranch at the time of the settlement? A. I don't remember the date, but it was in August, I think.

"Q. Of what year? A. The 27th of August.

"Q. Of what year, I said? A. 1906.

"Q. About how long was she there? A. Well, she wasn't there long. I can't remember, but it wasn't but a few days.

"Q. What occurred in her matters while she was there? A. N. B. Smith, I think was down there, and was talking about her loaning money. There was a party wanted to borrow the money.

"Q. Was there any settlement made with her? A. The settlement wasn't made at the ranch.

"Q. Where was it made? A. At White Sulphur Springs.

"Q. Was it made that year? A. Yes, sir. I wasn't present at the settlement. N. B. Smith done the entire business, he and the court, as I recollect it.

"Q. Do you recall any talk when N. B. Smith was down at the ranch and the complainant was down at the ranch, about her affairs? A. I cannot recall just what it was, no. They had some talk, but I cannot—

"Q. Where did they have it? A. In the office.

"Q. Who was present? A. I don't know as I could say exactly who was present.

"Q. Was the complainant present? A. The complainant was present.

"Q. Was N. B. Smith present? A. N. B. Smith and myself.

"Q. Were you present? A. Yes, sir, and I think Mr. Flatt and I think probably my wife was. I don't know whether she was or not. I know at the time she was there it was talked over, but I can't recall the conversation.

"Q. What was talked over—what was it about, generally? A. It was talked about what was best for her to do with the money, as near as I can remember.

"Q. Was there any talk about the matter of your purchase of the stock of the company? A. I don't remember that that was talked over, but it might have been; I don't remember.

"Q. Was there any explanation given her of her matters and how the results and amounts due her were arrived at? A. I think that N. B. Smith gave her full information in regard to it. I think so, as near as I remember, but I cannot recall what it was."

N. B. Smith was also questioned in respect to the same matter, and also in respect to a visit of the complainant to Montana in 1904, when she was about 16 years old, as follows:

"Q. Do you recall when the plaintiff came out to Helena in 1904? A. Yes, sir; I recall when she came out here.

"Q. Where did she stop, if she stayed at all in White Sulphur Springs? A. Well, she stopped with us a few days.

"Q. At your home? A. Yes, sir, at our home.

"Q. With yourself and wife? A. With myself and wife.

"Q. And during that time, was any explanation given to her of these matters about which you have been testifying? A. Yes, sir.

"Q. What was done in that regard, you may tell. A. I showed her the final account of myself as trustee or executor, as in my letter, I invited her to come out here, that was in 1903. I also showed her the annual account. I said I would be glad to explain the affairs of the estate to her, that I was fixing up the annual account as guardian and she was there at the time, and when I was at the courthouse I got the final account and the annual account as executor and showed them to her.

"Q. Where were you when you showed them to her? A. I was there in my office at the little room at the north—there is two rooms to the office.

"Q. You said as you had invited her in your letter? A. Yes, sir, in my letter I had invited her.

"Q. What letter did you refer to, the one of August 13, 1903, that is in evidence here? A. August 13, 1903.

"Q. In connection with the explanation of the papers in question, did you say anything to her about it, or what did you say? A. Oh, I explained to her about the sale of the property.

"Q. As you have—

"Witness (continuing): I explained to her about the sale of the property and the items of the account.

"Q. Did you tell her the facts about those matters as you have told them here. A. I related the facts to her about the sale and why I sold the property.

"Q. Well, did you give her information the same as you now tell the matter, or definitely? A. Well, the same information—probably I didn't go into it quite as fully, but I explained generally the nature of the transaction and why I sold it, and what I got for it, and showed her the accounts.

"Q. Do you remember, in 1906, when the complainant came out to Montana? A. Yes, sir.

"Q. Did you see her at that time? A. Yes, sir.

"Q. Where? A. I saw her down at the ranch of Smith Bros. Sheep Company.

"Q. What was she doing down there? A. She had, I think, came back from Germany if I remember correctly, and was going back.

"Q. Well, that states where she came from and where she was going to, but I asked you if you knew what she was doing down there on the ranch? What was she there for. A. Well, she was there, looking after her estate. I don't remember whether the final account had been put in or not, but we discussed the matter there in our presence there in the office.

"Q. In the office, where do you mean? A. The office of Smith Bros. Sheep Company.

"Q. Who discussed it? A. Well, I discussed it with her and Uncle John.

"Q. Who was present? A. Mr. Flatt was present.

"Q. And you discussed what matter? A. Oh, about the sale of the property, and how it had been handled, and how we had tried to manage the property for her."

In the same connection a letter written by N. B. Smith to the complainant's younger sister on the 7th of April, 1905, is pertinent:

"N. B. Smith, County Attorney, Meagher County.

"White Sulphur Springs, Montana, April 7th, 1905.

"Dear Anna: Your favor of the 4th inst. came to hand. Will say presume you have my letter inclosing the $500.00. Yes, you will get your money in June. You need be at no expense about attorney's fees. I would like to have you come out and be here when the estate is settled. You can go over all the accounts with me and see where the money has gone. I have taken receipts for everything and have paid out all money by checks. I want you to know everything and then I will feel that I have done my duty. * * * Your cousin, N. B. Smith."

This suit was commenced August 22, 1907, to annul the sale of the stock in so far as concerns the complainant, and to recover the complainant's share of the stock so sold—the complainant having tendered, and continuing to tender, to John M. Smith her proportionate share of the money he paid for the stock, together with interest thereon, the original bill alleging, among other things, that the sale of the stock "was illegal and fraudulent, and that it was collusive; that the said John M. Smith was without right to purchase said property; that his duty as guardian was incompatible with the purchase by him of said property; that more than one year had elapsed from the date of the making of the order of sale thereof; that no reappraisement of this property was had; that said John M. Smith had by his affidavit and otherwise procured or aided in procuring the making of the order of sale; that he was the president of the said company, had been for many years a part-

her in business of William A. Smith, and stood at that time in the place of a parent to said children; that meanwhile, as your oratrix alleges on her information and belief, the said John M. Smith had decided to retain his stock in the said company and to continue the business thereof, and did in fact do so; that the business and prospects of said company had greatly improved during the said year, and that the business in which it was engaged was, at the time of the sale, increasing in prosperity and in value, and that the property of the said company was also steadily increasing in value; that the reasons given in the petition of the said executor and in the affidavit of the said John M. Smith for the sale of the said property had, most of them, ceased to exist, and that all had lost their force, if they ever had any; that it was then and there to the interest of the said children and of the said estate of the said William A. Smith to retain the ownership of the said shares of stock, but notwithstanding all these considerations, the said Napoleon B. Smith and the said John M. Smith colluded and confederated, as your oratrix alleges on her information and belief, to secure the said property to the said John M. Smith, and to sell the same to him at much less than its real value, and that in pursuance of this collusion, the said Napoleon B. Smith proceeded to make the alleged sale to the said John M. Smith, and to obtain confirmation thereof, and delivered said shares to him, and the latter to enter into the alleged contract of purchase heretofore set out; that the value of said shares of stock so sold to the said John M. Smith was very much in excess of the price paid therefor, and that the price was greatly disproportionate to the real value thereof; that the said Napoleon B. Smith had full knowledge of the petition of said John M. Smith for his own appointment as guardian and of the appointment of the said John M. Smith as guardian; that the said Napoleon B. Smith is a nephew of the said John M. Smith, and was at the times in question herein his attorney and connected with his business, and the said John M. Smith was one of the sureties on the bond of the said Napoleon B. Smith as the executor of the estate of William A. Smith; that by means of his appointment as guardian, and within less than two months after the day mentioned in the accounts of Napoleon B. Smith as that of the receipt of the $75,000 from the said John M. Smith, as the balance of the purchase price, the said John M. Smith came into possession of all the moneys and property of the said estate and of the very money which he was supposed to have paid to the estate of William A. Smith; that later, to wit, on or about the 11th day of December, 1900, the said John M. Smith procured from the said District Court an order authorizing him to borrow from the funds in his hands belonging to the said minors, to wit, the sum of about $82,000, according to the statements in said order, at the rate of 3 per cent. per annum; that the said John M. Smith is still the holder of the aforesaid shares of stock of the said corporation; that the same are now of great value; that the rate of interest charged by banks and other money lenders was at the times in question not less than 8 per cent., and that the said John M. Smith had to pay that rate or more on moneys borrowed."

John M. Smith having died pending the suit, the bill was revived as against his widow as executrix of his estate, and after the taking of the evidence this amendment to the original bill was allowed by the court below:

Instead of the words, "That the plaintiff has no knowledge of the payment of these sums except what appears in the papers on file in the matter of said estate," appearing in the original bill, the following was inserted: "That the said pretended payments of $10,000 and $75,000 respectively, were not made with money, but only as follows, to wit, the said John M. Smith obtained credits at the Bank known as the Union Bank & Trust Company, in Helena, Montana, for the said sums, by giving his personal notes therefor, and sent his checks for similar sums to N. B. Smith; that John M. Smith was then in California and sent his checks from there; that in the month of February, 1899, said N. B. Smith obtained with the check of $10,000 a certificate of deposit for a similar sum from said bank; that on or about April 27, 1899, defendant N. B. Smith turned in to the said bank the said certificate of deposit, and the said check of John M. Smith for $75,000, and in exchange therefor obtained a certificate of deposit for $80,000 to his order as executor and an open account credit for $5,000, to his personal or-

der; that on June 14, 1899, the said N. B. Smith endorsed and turned over to said John M. Smith, who had meanwhile been appointed guardian of the plaintiff and of her brother and sister, the said certificate of deposit for $80,-000, and gave him his (N. B. Smith's) check on said bank for $2,174.20; that within three days thereafter the said John M. Smith indorsed and turned in to the said bank the said certificate of deposit of $80,000, and the said check of N. B. Smith in part payment of the notes which said John M. Smith had given to the said bank, as aforesaid, and then, or later, paid the balance of said notes with moneys obtained from Smith Bros. Sheep Company."

There having been judgment for the defendants in the court below, the complainant there brought the present appeal.

T. J. Hoolan, William Scallon, and Walsh & Nolan, for appellant.

R. Lee Word and William Wallace, Jr., for appellees.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge (after stating the facts as above). We have stated only what we deem the controlling facts, although the whole record, as well as the voluminous briefs, have had careful consideration. That a guardian has no legal or moral right to appropriate his wards' money to the payment of his own debts, even though he expects to return it, is a proposition too plain for discussion. And that is just what the correspondence, as well as the testimony of John M. Smith above set out, shows that he did. We think it is quite evident from the record that both he and the executor of the estate of William A. Smith, deceased, were at first desirous of protecting the interest of the minors, and to that end made bona fide and diligent efforts, but without success, to sell both the interest of John M. Smith and that of the estate together. Finally, however, those good intentions gave place to evil ones. The first evidence of that fact is shown in John M. Smith's obtaining from the executor of his brother's estate an option on its interest in the stock at such a price as would give him "a marégen to work on." This is made evident, we think, by the letters of John M. Smith to the executor of March 19 and July 2, 1898. So far as appears, the first absolute offer the executor received for the interest of the estate in the stock was a cash offer of $80,000 received on the 30th of December, 1898, from one Neill, notice of which was communicated to John M. Smith by the letter of the executor of the next day, in which the latter informed John M. Smith that he could have that interest for $85,000 cash. While it seems from the record that John M. Smith wired the executor his willingness to take the stock at the price of $85,000, the letters passing between them, as well as the letters passing between John M. Smith and Mr. Ramsey, cashier of the Union Bank & Trust Company, very clearly show that the terms and conditions of such sale were not settled by the executor's proposal and John M. Smith's telegraphic reply thereto.

The record further shows that before any terms or conditions of such sale were agreed on by and between the executor and John M. Smith, and while the latter was asking of the executor time within which to make payment for the stock, the executor wrote to John M.

Smith a letter which appellees' counsel concede contained the suggestion that John M. Smith make application for the guardianship of the minor children, and which we think, from other letters in evidence as well as from the circumstances of the case, contained a suggestion of the plan or arrangement which the record shows was thereafter actually carried out. The letter referred to was written January 20, 1899, but was not produced in evidence; it having disappeared in some undisclosed way. It will be borne in mind that at this time the executor was at White Sulphur Springs, Mont., Ramsey, cashier of the Union Bank & Trust Company, was at Helena, Mont., and John M. Smith was at Pasadena, Cal. The executor and John M. Smith were exchanging letters in respect to the terms and conditions on which the former would sell and the latter would buy the stock of the deceased, William A. Smith. Before the executor's letter of January 20, 1899, could have been received at Pasadena, John M. Smith wrote him from that place, under date January 22, 1899, as follows:

"N. B. Smith Dear Nefue I received yours of the 16 in reply to my telegram I had written 2 letters that you have no dout receved befoar this in which I asked turms but have not herd from ether yet it dont look as tho Miles is going to make a deel. I now will ask you the amount you wish me to pay down on the property & what interst you want on the balence I will take the astates Stock at the $85000 and no claim on the astate for enny money advanced it at enny time tell me the least you will take as a down payment & what time you will give on the balence & & what interst ontill payed & you hold all the property as securty I made you a propersition in my last but dont know how it will soat you pleas give me yours best turms as soan as you get this and I will arange to meet it on the $85000 bases. Yours Truly Your uncle John.

"I think the Coart will aprove of the Securty & offer for the balence I know your Bondsman would I dont think that it will take me longer then May the first to make some turn So I will get the balence for you."

John M. Smith had applied to the Union Bank & Trust Company of Helena, Mont., for a loan of $90,000, and on the 21st of January, 1899, the cashier of that institution, Mr. Ramsey, wrote on its behalf from Helena to him that the bank would loan him the $90,000 he asked for at 9 per cent. per annum, and on the 28th of the same month wrote him as follows:

"Mr John M. Smith, Pasadena, Cal.

"Dear Sir: We now have your telegram reading: 'Do not want money' which is interpreted to mean that you are not in a position to use the money just at the present time. But that you may possibly desire to later. If our surmise is correct, I beg to advise you that we will be glad to figure with you whenever you are ready; but we would not of course want to promise so large an amount of money at any time in the future as it is a considerable sum and we may have to invest it elsewhere. Just at this time we would be very glad to make the loan and it is possible we may be in the same position whenever you get ready.

"Yours respectively, George L. Ramsey, Cashier."

Evidently something occurring between John M. Smith's application for the loan and January 28, 1899, changed his desire to borrow $90,-000 at 9 per cent. per annum.

On the 27th of January, 1899, John M. Smith wrote to the executor as follows:

"Pasadena, Cal., Jan. 27.

"N. B. Smith:

"Dear Nefue: I receved yous of the 20 & I think your plan good I will take steps to get the ten thousand down payment & we will proceed to business at once I will write to the bank & arange for the money if you have me apointed garden for the Children as soon as I as sell out I uou & ["wan to," according to original exhibit] invest in Gove bonds all thair money and also my one as I dont intend to try to dew anny buisness after I sell out & I fully intend to let goew this spring I think your sugjestion a good one I think I should have the children come out hear the schools is first clas & the climat is good also good society Yous Treuly J. M. Smith."

Three days before the letter last quoted was written, and four days after the executor's letter of January 20th, the latter wrote to John M. Smith as follows:

"N. B. Smith, County Attorney, Meagher County.

"White Sulphur Springs, Mont., Jan. 24th, 1899.

"J. M. Smith, Pasadena, California.

"Dear Uncle: Your letter of the 16th of Jan. came to hand. I can not sell the way you indicated. The only way I can sell is for cash down. If you are appointed guardian of the children then I could turn the money over to you. As I told you all the time I have no right to sell on credit. You had better forward me a draft for ten thousand and then I will file the petition, and on the approval of sale by the Court the balance can be paid. The offer that I had was a cash down offer. If you but [buy] the stock the Company can run on just the same and I can act as one of the trustees as I have some stock in my own name. Give my love to all. Yours, etc."

In both of the two letters last above quoted there is, in our opinion, a very strong indication that in the missing letter of January 20th from the executor to John M. Smith, the suggestion was not only made that the latter apply for the guardianship of the children, but also that, in the event of his appointment as such, their money, which the executor would turn over to him, could be used by him in paying for the stock; for in John M. Smith's letter of January 27th he said:

"I receved yous of the 20 & I think your plan good I will take steps to get the ten thousand down payment & we will proceed to business at once I will write to the Bank & arange for the money if you have me apointed garden for the Children as soon as I as sell out I uou & ["wan to," according to original exhibit, appellees' brief says] invest in Gove bonds all thair money and also my one as I dont intent to try to dew anny buisness after I sell out & I fully intend to let goew this Spring."

And in the executor's said letter of January 24, 1899, to John M. Smith, he said:

"If you are appointed guardian of the children (as was concededly suggested in the missing letter of January 20th) then I could turn the money over to you. As I told you all the time I have no right to sell on credit. You had better forward me a draft for ten thousand and then I will file the petition, and on the approval of sale by the Court the balance can be paid."

On the same day that John M. Smith wrote the above-mentioned letter of January 27th to the executor, he also wrote from Pasadena a letter to Ramsey, in which he said:

"I received a letter today from the administrator & now I am in shape to use ten thousand of the money at once. I wish the lone for 6 months with the understanding that I have the privilege of paying it at enny time I can befour it is dew intrest to be at the same for what time I have used the

money. You understand I want the money to make a payment on the estate of my brother the money will be turned ovr to the administrator N B Smith at White Sulpher Springes. if you will you can make out a Note for ten thousand & send it hear to me I will signe & retern then I will turn it over to the admnestratr & close a deel then I will be the entier oner of the Smith Bros Sheep Co."

And on the 31st of January, 1899, John M. Smith wrote from Pasadena to Mr. Ramsey as follows:

"I have taken the liberty of drawing a check on your Bank for ten thousend Dollars $10,000—in favor of N. B. Smith of White Sulphr Springes the administratr of my Brothers astate I dont think that the money will be caled for only plast to his cr. I inclose his letter so you can se how we intend to manage so that I don't think we will have to call for enny of the money will leave it as a creddet for when I am apointed gardeen of the children I will turn it all back to the Bank & pay what intrest has acrued for what time we have the money. hoping this will meat your aprovel I wrote you a letter a few days ago asking you to forward me a Note for $10,000—for me to signe but I have not received it yet hoping you can favor me with my request & oblige."

The record shows that the scheme outlined in the correspondence above referred to was strictly carried out. John M. Smith drew his check on the Union Bank & Trust Company for $10,000 in the executor's favor, as a payment on account of the purchase of the stock, giving his note to the bank therefor, and in his subsequent letter to Ramsey of March 1, 1899, wrote:

"I cant say jest when I will be cald to turn over the other $75,000—on the Ranch Deele. the Money will not be drawed out of the Bank but left as a Cr to the administrater N B Smith as soon as I am apointed gerdean the money will be turned back to me I pay intrest for what time I have it."

John M. Smith's $10,000 check was deposited by the executor with the Union Bank & Trust Company, he taking from the bank a certificate of deposit in that sum. The executor proceeded to make application to the probate court for confirmation of the sale of the stock to John M. Smith for the sum of $85,000, and about the same time procured an attorney named Waterman to make application on behalf of John M. Smith for his appointment as guardian of the persons and estates of the minors. The order confirming the sale and appointing John M. Smith such guardian were made on the same day, to wit, March 28, 1899. Subsequently John M. Smith drew a check on the Union Bank & Trust Company in favor of the executor, for the balance of the purchase price, to wit, $75,000, and in a letter from Pasadena, Cal., to Mr. Ramsey, written on the 18th of April, 1899, notified him of that fact, at the same time saying in his letter:

"But I dont think he will Send it in ontill I get back."

On the 27th of the same month John M. Smith executed to the Union Bank & Trust Company his note for $75,000, bearing interest at the rate of 9 per cent. per annum, the amount of which the bank put to his credit, and with which it paid the check for $75,000 which John M. Smith had given to the executor, such payment being then charged by the bank to John M. Smith's account. At the same time the $10,000 certificate of deposit was surrendered by the executor, who took from the Bank & Trust Company in lieu of it and the $75,000 a

certificate of deposit to his order for $80,000, and $5,000 in money, which latter sum he thereupon deposited to his personal credit—$2,-161.49 of which he paid himself as due him "on the sale of the property" and the balance to other persons and for other purposes.

On the 28th of the same month of April John M. Smith sent from California to the executor his power of attorney appointing the latter his attorney in fact, with instructions to indorse the stock that he had bought to the Union Bank & Trust Company as collateral security for the payment of his $10,000 and $75,000 notes then in the bank, and with the request that the executor meet him in Helena about the 17th or 18th of May following.

On the 18th of May, 1899, John M. Smith returned to Montana, and on the 25th of that month executed his bond as guardian and took the oath of office. Within a few days thereafter, to wit, June 1, 1899, the executor filed the final account of his administration of the estate of William A. Smith, and on the 12th of June of the same year a decree settling his accounts and distributing the estate was signed, and on the 14th placed on file. On the same day, to wit, June 14, 1899, the executor paid the entire amount in his hands over to the guardian, John M. Smith, taking his receipt therefor as such guardian. John M. Smith thereupon went to Helena, Mont., and on the 17th of June, 1899, there used that money of his wards in discharging his indebtedness to the Union Bank & Trust Company as far as it would go, giving a new note to the bank for the balance due it from him.

N. B. Smith testified that he did not know until the fall of 1899 what use the guardian had made of his wards' money; that "in October, or before October," 1899, the guardian told him; yet, in his subsequent letter of November 20, 1899, to his aunt, Mrs. Reynolds, who had charge of the children at her home in Fayette, Ohio, he said:

"In regard to Uncle John buying the stock, will say that he borrowed the money from a bank in Helena to buy the stock. I would not let him have the stock until he had actually paid me the money. I had the money in my name in the bank until I was finally discharged from my trusts. When I made my final account I showed the judge my draft, and my bank account subject to check. I turned over to him the money and took his receipt for the same, and filed the same in court and the same is now a matter of record. The Union Bank & Trust Company furnished his bond and same is perfectly good. He has to pay the bank quite a sum of money for furnishing the same. I think he has to pay about three hundred dollars a year for his bond. The judge and Uncle John and I talked over the matter of the use of the money, and the understanding was that he should pay four per cent. for the use of the money until such time as it should be invested in bonds. That is better than we could do with government bonds, and as long as the Union Bank & Trust Company is his surety the same is perfectly safe."

There is in this letter not only no statement of the fact then confessedly known to the writer that the guardian had misappropriated the money of his wards to the payment of his own indebtedness, but the clear implication that the guardian then had on hand their money, secured by a perfectly good bond, furnished at his expense by the Union Bank & Trust Company. Not only did the former executor of the estate of William A. Smith and subsequent attorney of the guardian of the minors fail to disclose to his aunt having charge of the children the misappropriation of their funds, but his own testimony

is that after acquiring knowledge of the fact of such misappropriation, he failed to report it to the court, although keeping the guardian's accounts at least as early as October, 1900, and being on the 11th of December of that year substituted of record as attorney of the guardian in place of the former attorney, Waterman, by an order of the court of that date, containing, among other things, the following:

"John M. Smith, the guardian of said minors, having made application to the court for an order authorizing him to borrow the funds in his hands belonging to said minors amounting to the sum of about $82,000 at the rate of three per cent per annum. The court being fully advised in the premises: It is ordered that said guardian be authorized to borrow said sum of $82,000 at the rate of 3% per annum, and to so hold the same at said interest until the further order of this court."

It is true that N. B. Smith testified that he did not procure this order to be made, and did not know of it at the time, but he admits that he thereafter acted as the attorney of the guardian, and prepared the final account of the latter, in which the guardian was charged interest on the money of the wards only from December 11, 1900, and at the rate of 3 per cent. per annum, and in which the wards were charged for the money paid by the guardian to the surety company for going on his bond as guardian. Before so acting N. B. Smith knew that long before the making of the order of December 11, 1900, the guardian had misappropriated all of the money of his wards by the payment of his own indebtedness with it, for he himself so expressly testified, and, according to his own testimony, he withheld that information from the court and acted under and by virtue of the court's order substituting him as attorney for the guardian in place of the guardian's former attorney, which order recited the false pretense that the guardian then made application to borrow the money of his wards which he had long before misappropriated to his own use, upon which sham and false statement the court undertook to make an order authorizing the guardian to borrow his wards' money at the rate of 3 per cent. per annum.

We are of the opinion that the record shows that both the sale of the stock of the estate of the deceased William A. Smith and the subsequent misappropriation of the money of the minors by their guardian were parts and parcels of a scheme entered into by and between N. B. and John M. Smith, and consummated as hereinbefore indicated, which was a fraud both upon the minors and the probate court, and that therefore the judgment appealed from should be reversed and the cause remanded, with directions to enter a decree for the complainant to the effect that upon the return to the representative of the estate of John M. Smith, deceased, of the money received by her for her interest in the stock from her guardian, with legal interest thereon, her proportion of the said stock be returned to her,[1] and providing for an appropriate accounting on her behalf, and for such proceedings as may be requisite and appropriate as will place her in such position as she would have been in if the sale of said stock had not been made, and with costs.

It is so ordered.

[1] Amended pursuant to order entered October 28, 1910.